**Nicolae DOZSA, Plaintiff,**

v.

**CRUM & FORSTER INSURANCE CO. and Prudential Property and Casualty Insurance Co., Defendants.**

**Civ. A. No. 89–1767.**

United States District Court, D. New Jersey.

Decided May 8, 1989.

Filed July 7, 1989.

---

John S. Hoyt, III, Morristown, N.J., for plaintiff.

Jackson, Lewis, Schnitzler & Krupman by James R. Williams, New York City, and Greenberg, Dauber & Epstein, P.C. by Ina B. Lewisohn, Newark, N.J., for defendant Crum & Forster Ins. Co.

Shanley & Fisher, by Charles A. Reid, III and Thomas M. Murphy, Morristown, N.J., for defendant Prudential Property and Cas. Ins. Co.

## OPINION

DEBEVOISE, District Judge.

### I. *The Proceedings.*

Plaintiff, Nicolae Dozsa, husband of an employee of Crum and Forster, Inc., is covered by the Crum and Forster, Inc. Medical Plan (the "Plan" or the "Medical Plan"). Defendants are Crum and Forster and/or the Plan and The Prudential Insurance Company of America, which is a plan administrator.

Plaintiff has been diagnosed as suffering from a type of cancer known as multiple myeloma. He has undergone intensive chemotherapy treatment which has ceased to be effective. His physician Stephen Davis M.D., a specialist in oncology, referred him to the oncology department of the Johns Hopkins Medical Center in Baltimore, Maryland, where it was concluded the greatest likelihood of successful control of plaintiff's illness is administration of a procedure known as autologous bone marrow transplant ("ABMT"). The cost of such treatment is $75,000 to $125,000. Without such treatment plaintiff will in all probability die within six months. There is no other treatment with any promise of effectiveness.

The Plan and Prudential have concluded that ABMT is a medical expense not covered by the Plan. Consequently the Plan and Prudential refused to certify to Johns Hopkins that the Plan would pay for plaintiff's ABMT. Without such certification Johns Hopkins refused to perform the procedure. Plaintiff has no funds with which to pay for the procedure himself. Unless the procedure is performed fairly soon, plaintiff's condition will deteriorate to the point where he will no longer be a suitable candidate for ABMT.

Plaintiff instituted a proceeding in the New Jersey Superior Court seeking a judgment declaring that plaintiff is entitled to coverage and benefits for ABMT treatment. Defendants removed the action to this Court on the grounds that it involved a federal question, that is, the question of coverage under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1001, et seq.

On April 28, 1989 I signed an order requiring defendants to show cause why they should not be enjoined from denying coverage for the proposed ABMT procedure. In view of the emergent nature of the application a hearing was held during the evenings of May 2nd and May 3rd. Plaintiff and defendants each presented the testimony of two unusually knowledgeable physicians.

### II. *The Facts.*

The terms of the Plan are set forth in a detailed Summary Plan Description. It is designed to provide medical care for Crum and Forster employees and their depend-

ents. The benefits and exclusions are described in the Summary.

The Plan is funded through two sources: (i) elective contributions and allocations of benefit credits out of the compensation paid to employees of the sponsoring employer, and (ii) contributions of the employer.

Crum and Forster is designated under the terms of the Medical Plan as the "plan administrator," within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. Section 1002(16)(A), and because of its authority with respect to the Medical Plan under the terms of that plan, it is also a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. Section 1002(21)(A).

The Plan provides for certain hospitalization pre-screening and early determination of services under the Prudential Patient Advisory Support Service Program—Pre–Admission and Concurrent Review Service ("PACRS"). For purposes of administrative functions and early determinations of need under PACRS, the terms of the Plan delegate initial administrative and determination authority to Prudential, and with respect to those services Prudential acts as a plan administrator. Prudential performs the above mentioned services under an administrative services agreement with Crum and Forster.

Stephen Davis, M.D., is an oncologist who has had extensive training and experience in that field. He has taught and written extensively on the subject and has an extensive practice. Dr. Davis started treating plaintiff for multiple myeloma in November 1984. He administered chemotherapy in standard doses and pursuant to the standard regimen. Initially plaintiff responded well. After he suffered a relapse Dr. Davis administered chemotherapy using different agents. Plaintiff entered into a period of partial remission.

In 1988 plaintiff became resistant to standard chemotherapy, relapsing after receiving the standard doses. In the fall of 1988 Dr. Davis stopped chemotherapy for the reason that it was no longer effective. He recommended that plaintiff go to Johns Hopkins Medical Center to determine whether he would be a suitable candidate for ABMT. In Dr. Davis' opinion ABMT was the only treatment available to plaintiff, and that unless he were given such treatment he would soon die.

ABMT is a medical technique for treating various types of cancer. It has been used extensively and effectively in treating leukemia, Hodgkin's Disease, lymphoma and breast cancer. More recently it has been used at a number of highly respected ABMT centers to treat multiple myeloma.

ABMT is a procedure pursuant to which a patient's bone marrow is removed and, at Johns Hopkins, purified of cancer cells. Meanwhile the patient is given substantially greater levels of chemotherapy than he or she could have withstood if the bone marrow had remained in place. Thereafter the purified bone marrow is restored to the patient. Since there is a direct correlation between the level of chemotherapy administered to a patient and the curative or controlling effect of the chemotherapy, a patient who is able to withstand the higher level of chemotherapy has a higher likelihood of effectively controlling the disease. By performing ABMT, toxicity is avoided.

John R. Wingard, M.D., is a physician practicing medicine at the Johns Hopkins Oncology Center. He's an associate professor of oncology and assistant professor of medicine.

Dr. Wingard and his associates at Johns Hopkins to whom Dr. Davis referred plaintiff, reviewed plaintiff's case. They concurred with Dr. Davis' recommendation that plaintiff undergo high-dose chemotherapy and an ABMT as his best option for providing long-term control of the disease. They also were of the opinion that time was of the essence with respect to the treatment, because there was a window of time during which the treatment could be rendered. They found that plaintiff was a suitable candidate for the treatment, but if he reached an excessive state of toxicity or if the multiple myeloma progressed significantly by the time he submitted to the transplant, he would become ineligible to have the transplant performed. Death would ensue.

John Hopkins has stated that it is unable to offer to conduct the procedure without charge to persons outside its immediate service area. It has no research grants to cover the charges. The cost involved, as stated previously, is $75,000 to $125,000.

The Crum and Forster Medical Plan contains a procedure for early determination of need for hospital confinement. This is designated as Pre-admission and Concurrent Review Service ("PACRS"). As stated in the Plan:

"Eligible expenses do not include expenses for services or supplies which are not 'reasonably necessary' for medical care of a diagnosed sickness or injury. To be considered 'reasonably necessary,' a service or supply including a hospital confinement, must meet the test described in the section 'Medical Expenses Not Covered' on page 18. Prudential will make a Determination of Need for each day of an in-patient hospital confinement. That Determination of Need is solely for the purpose of determining Eligible Expenses under the Plan and is not medical advice."

Plan at pages 13 and 14.

Medical expenses not covered are defined as follows:

"Services and supplies not reasonably necessary for the care and treatment of a diagnosed injury or sickness. To be considered medically necessary a service or supply must meet all of these tests.

"a. It is ordered by a doctor.

"b. It is commonly and customarily recognized throughout the doctor's profession as appropriate in the treatment of the sickness or injury.

"c. It is neither *educational nor experimental* in nature nor provided primarily for research purposes.

"d. In the case of hospital confinement it is not allocable to scholastic education or vocational training of the patient."

Plan at page 18.

Under the PACRS program the covered person must request Prudential's Determination of Need before hospital confinement begins, submitting to Prudential specified information. Prudential's Support Specialist will tell the physician and the hospital by phone and by written notice the number of days of in-patient hospital confinement that Prudential approves as needed for the care of the patient's condition. Failure to comply with the PACRS program can result in smaller benefits under the Plan. However, "(t)he determination of need does not guarantee either payment of benefits or the amount of benefits."

At page 8 of its brief Crum and Forster states that it "has the authority upon the beneficiary's request to reevaluate the determination of Prudential", citing page 21 of the Plan. I do not read the language on page 21 as applying to Prudential's PACRS determination, and I see no provision for an appeal from such a determination. Rather page 21 deals with rejection of claims for medical benefits which would necessarily follow the receipt of hospital and medical services. In the event of a denial of benefits review can be requested of Prudential's Claims Administrator, and further "(t)he Plan Administrator [Crum and Forster] will reevaluate all the information and [the claimant] will be informed of the decision in writing in a timely manner." While this language contains some ambiguity it seems evident that Crum and Forster, as the Plan Administrator, retains ultimate authority to grant or withhold benefits.

In early February 1989 plaintiff proceeded under the PACRS program, requesting Prudential to issue a determination that treatment by ABMT will be an eligible expense under the Plan. On February 10th, 1989, Barry Reid, M.D., Director, Medical Services, wrote to Dr. Davis declining to pre-certify the procedure. The letter stated:

"We were notified of the tentative admission of Nicolae Dozsa to Johns Hopkins Hospital with a diagnosis of multiple myeloma for an autologous bone marrow transplant. Autologous bone marrow transplants have been determined to be investigational and ineligible under the employee's benefit plan. Due to the investigational nature of this treatment,

we are unable to pre-certify this admission.

"If you may have any additional information which you feel may be helpful in evaluating the eligibility of the proposed in-patient admission please forward the information to me. Eligible services and charges arising under such an admission may be eligible for payment under the plan as determined by this subsequent review."

A further request for coverage was submitted to Prudential in the form of a letter from Dr. Wingard. By letter dated March 27, 1989 Kathy King, Claim Advisor for Prudential, informed Sara Perkel, Administrator of the Johns Hopkins Oncology Center that:

"Based on the information submitted, it has been determined that an autologous marrow transplant would be considered investigational for the diagnosed condition. Therefore, charges for this service will not be eligible for reimbursement under the Crum and Forster Medical Plan."

David W. Plocher, M.D., is a physician employed as Vice–President, Medical Services, by Prudential. In his affidavit and testimony he described the process by which Prudential reviews generally novel types of medical treatment to determine their entitlement to payment reimbursement under various medical plans. He stated, "[a] procedure or course of treatment does not become accepted in the profession until it has been demonstrated through clinical trials as being safe and effective for the condition. One of the best ways to determine the acceptance of such a procedure is through the published medical literature. Coverage usually commences after there is clear consensus in peer review medical literature." (Aff. at pages 3 and 4.)

ABMT was a very new procedure. According to Dr. Plocher, some months before plaintiff sought coverage Prudential re-evaluated the treatment, which had previously been disapproved for coverage in all situations.

Prudential followed its usual procedure to determine if the treatment is safe and effective. Dr. Plocher and his associates analyzed peer review medical literature on the subject; he reviewed the procedure with outstanding experts in the pertinent specialty field; he went to independent organizations of technology assessment; he submitted a proposal for coverage to 90 or more Prudential medical directors and other persons in the field for their comments. Thereafter the question of coverage of ABMT procedures was presented for a final decision to Prudential's headquarters vice-presidents for claims, marketing, law, underwriting and contract. That group is called the corporate technology assessment committee. In effect that committee determines what is covered in the various Prudential health insurance policies.

A Group Claims Division Memorandum dated February 8, 1989 set forth a decision of the committee concerning ABMT. It read, in part, as follows:

The Corporate Group Medical Department has determined that, as of 1/25/89, high-dose chemotherapy followed by autologous bone marrow transplantation (ABMT) is now eligible for several indications when *specific clinical criteria* are met.

Supplement #5 (dated 7/6/87) of GCLM 84–14 indicated that autologous bone marrow transplantation (ABMT) was investigational for all conditions. The Corporate Group Medical Department has determined that ABMT is now eligible for the following conditions *when specific clinical criteria are met:*

neuroblastoma

Hodgkin's disease

non-Hodgkin's lymphomas

acute lukemias—

    acute lymphocytic leukemia (ALL)

    acute nonlymphocytic leukemia (ALL)

Because there are specific clinical criteria under which ABMT is eligible, all claims and predeterminations for charges related to ABMT for the conditions listed above must be referred to the RGO Medi-

cal Director or City Medical Director for review. Similarly, all charges related to ABMT for conditions *other* than those listed above should be referred to the RGO Medical Director or City Medical Director for review."

Dr. Plocher testified that Prudential still considered ABMT for multiple myeloma to be investigational and therefore did not include it among the conditions for which ABMT payment would be reimbursed. He stated that the initial literature search exhibited a lack of consensus on the effectiveness and safety of ABMT for myelomas.

The literature consisted of analyses of two series of patients treated by Dr. Bart Barlogie and his associates at the Anderson Hospital and Tumor Institute in Houston. The analyses were contained in a series of articles: (i) Barlogie, et al., writing in the May 1986 issue of Blood, (ii) Barlogie, et al., writing in the January 1989 issue of Annals of Internal Medicine, and (iii) Cheson, et al., writing in the March 1989 issue of Blood.

Dr. Plocher found the studies described in the article not to be randomized, controlled or prospective with respect to multiple myeloma and thus not a basis for concluding that ABMT was a safe and effective treatment for that condition.

Between November 1988 and the end of February 1989 Dr. Plocher visited 14 bone marrow transplant centers and one of his associates visited three others. They held discussions with the physicians at those centers and examined their results. This included discussions with Drs. Wingard and Santos at Johns Hopkins.

Dr. Plocher participated in the decision to deny coverage to plaintiff. On February 22, 1989 Dr. Wingard of Johns Hopkins wrote to Dr. Reid at Prudential requesting reconsideration of the refusal to provide coverage for ABMT treatment for plaintiff, stating, "We concur with the recommendation that, after consideration of the limited therapeutic options available to Mr. Dozsa, high-dose chemotherapy and ex-vivo-purged autologous bone marrow transplantation is the best option to provide long-term control of the disease."

Dr. Reid referred the coverage question to Dr. Plocher for further review. Dr. Plocher in the turn sought the advice of an outside expert, Peter Mansell, M.D. In a March 22, 1989 memorandum to Dr. Plocher, Dr. Mansell wrote:

Thank you for asking me to see this case. As I said in regard to an earlier case on November 28, 1988 (letter enclosed) I do not think ABMT for relapsing multiple myeloma can be considered anything other than investigational at the present time. However, I am sure that this is one of the next areas that will develop since salvage therapy with more intensive chemotherapy short of ABMT is so poor. In a way I am conscious of the fact that we are really splitting hairs in the sense that once one accepts ABMT as a technique for one indication it is a short way to accepting it for all of the non-solid tumors.

In light of Dr. Mansell's opinion that use of ABMT for multiple myeloma was investigational and not finding any additional material in medical literature, Dr. Plocher concluded that Dr. Wingard's request for coverage should be rejected. That rejection was communicated by means of Ms. King's March 27, 1989 letter referred to above.

It is to be noted that both Dr. Reid and Dr. Plocher based their denials for coverage on the fact that ABMT is "investigational." However, the fact that treatment is "investigational" does not necessarily render an expense not covered under the terms of the Crum and Forster Medical Plan. Therefore, in the present proceeding defendants perforce have relied upon exclusions b and c—claiming that ABMT is not "commonly and customarily recognized for the treatment of sickness or injury" and that ABMT is "experimental" in nature. Whether ABMT treatment for plaintiff's multiple myeloma fell within either or both of those exclusions was the question at issue in the evidentiary hearing.

III. *Conclusions of Law.*

Plaintiff is a beneficiary, within the meaning of Section 3(8) of ERISA, 29

U.S.C. Section 1002(8), under the Medical Plan, a welfare plan subject to the provisions of Title I of ERISA, including its fiduciary responsibility and enforcement provisions. Sections 3(1), 3(3) and 4(a) of ERISA; 29 U.S.C. Sections 1002(1), (3), and 1003(a).

Crum and Forster is designated under the terms of the Plan as the "plan administrator," within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. Section 1002(16)(A), and because of its authority with respect to the Plan under the terms of that Plan, it is also a "fiduciary" within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. Section 1002(21)(A), with respect to the Medical Plan.

For purposes of administrative functions and early determinations of need under PACRS, the terms of the Medical Plan delegate initial administrative determination authority to the Prudential, and with respect to those services Prudential acts as a Plan administrator.

Plaintiff brings this action under, and the Court has jurisdiction pursuant to, Sections 502(a)(1)(B) and (3) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. Sections 1132(a)(1)(B) and (3).

Plaintiff seeks preliminary injunctive relief. This requires a determination i) whether plaintiff is likely to prevail on the merits, ii) whether plaintiff has shown that failure to grant the relief he seeks will result in irreparable injury, iii) whether other parties have shown that granting the relief will cause countervailing injury to them, and (iv) whether the public interest is affected by the granting or withholding of relief.

Turning to the question of the likelihood of plaintiff prevailing on the merits, the controlling issue is whether plaintiff's proposed treatment is within one or both of the two exclusions upon which defendants rely. That is, is the treatment educational or experimental or is the treatment of the kind not commonly and customarily recognized throughout the doctor's profession as appropriate in the treatment of multiple myeloma.

The standard of review of defendants' determination that plaintiff's proposed treatment falls within both of those exceptions is set forth in the Supreme Court's recent decision in *Firestone Tire and Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989):

> "Consistent with established principles of trust law, we hold that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan ... Thus, for the purpose of action under Section 1132(a)(1)(B), the de novo standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts Section 187, Comment d (1959)."

At —— and ——, 109 S.Ct. at 956 and 957.

The evidence demonstrates quite clearly that whether the de novo or abuse of discretion standard is applied, defendants' determination of noncoverage did not conform with the specific terms of this particular Medical Plan.

Both the exhibits and Dr. Plocher's testimony and affidavit disclose that Prudential never applied the language of Crum and Forster's Medical Plan. Rather Prudential engaged in an inquiry whether, in the words of its February 8, 1989 memorandum, ABMT was within "All Coverages, including Managed Medical." Thus Prudential sought to determine whether its own policies and similarly written plans provided coverage for ABMT treatment. The record does not disclose what criteria those policies and plans contained. Evidently if a treatment were still "investigational" it was not eligible for coverage.

That conclusion can be drawn from the fact that in the two letters in which Prudential rejected plaintiff's treatment they did so on the ground that ABMT for multiple myeloma was still "investigational." Further, the February 8, 1989 memorandum noted that certain ABMT treatments have become eligible for coverage because they were no longer "investigational," while presumably the other ABMT treatments, including that for multiple myeloma, remained "investigational."

Dr. Plocher stated most precisely when a particular treatment is no longer considered "investigational:" "When such therapy is backed by a consensus in peer-reviewed medical literature, we usually agree it is no longer investigational." Plocher affidavit at page 4. In the present case Prudential determined that ABMT for multiple myeloma was not backed by a consensus in peer reviewed viewed medical literature and that, therefore, it was "investigational." It denied coverage for ABMT for multiple myeloma both generally under all its own policies and specifically under Crum and Forster's Medical Plan because the procedure was "investigational."

Thus what both defendants did in effect was to ignore the language of Crum and Forster's Medical Plan and to insert a new exclusion. The new exclusion was that no coverage would be provided for therapy which is "investigational" and therapy which is not backed by a consensus in peer reviewed medical literature is "investigational". That may very well be the terms of an exclusion in Prudential's own medical policies and in other medical plans which it administers. It is clearly not a basis for exclusion in the Crum and Forster Medical Plan.

Evidently defendants recognized this fundamental error on their part, and at the hearing every effort was made to equate "investigational" with the two exclusions in the Medical Plan. While it is true that a lack of peer reviewed medical literature might constitute some evidence of nonrecognition of the therapy throughout a doctor's profession, it is certainly not conclusive evidence. The four very talented expert witnesses in the present case were in disagreement on the question whether the literature concerning ABMT treatment for multiple myeloma constitutes backing of the treatment by a consensus in peer reviewed medical literature and thus supportive of coverage even under defendants' mistaken reading of the Plan language. It is unnecessary to decide that question one way or another because the undisputed testimony of Dr. Wingard and Dr. Davis establishes 1) as proposed for plaintiff the treatment was not educational or experimental in nature and was not to be provided primarily for research purposes and 2) it is commonly and customarily recognized throughout Dr. Wingard's profession as appropriate treatment of multiple myeloma.

As to the experimental in nature issue, Dr. Davis had concluded that plaintiff could receive no further benefit from standard chemotherapy treatment. He referred plaintiff to Johns Hopkins for determination whether he was an acceptable candidate for ABMT treatment which would involve removal and purification of his bone marrow, the administration of much higher than standard levels of chemotherapy and the reintroduction of purified bone marrow. After studying plaintiff's records Dr. Wingard and Dr. Santos concluded that plaintiff was a suitable candidate for the therapy.

This was to be nothing more than the normal treatment accorded a patient. It wasn't to be educational, it wasn't to be experimental; it wasn't to be provided primarily for research purposes. It was simply the only appropriate treatment available to treat plaintiff's condition.

Defendants note that the results of plaintiff's treatment will become part of the data used in evaluating the procedure. They note an article by Armatage and Gale which states that further study of ABMT for multiple myeloma is needed and that there were many matters requiring future investigation. Such would be true of many medical procedures, particularly in the field of cancer therapy. That does not render

the treatment experimental as applied to plaintiff.

Turning next to the question whether ABMT treatment for multiple myeloma is commonly and customarily recognized throughout the doctor's profession as appropriate in the treatment of multiple myeloma. First it must be determined what doctors we are talking about. Rationally such doctors must be those who would work in the field of ABMT treatment and other oncologists who know about such treatment.

There is nothing new about the various components of ABMT treatment. Bone marrow transplants have been performed for many years. It has long been recognized that higher doses of chemotherapy are more effective in killing tumor cells and that the limiting factor in raising chemotherapy dosage is the effect on the bone marrow. Defendants' expert witness Howard Lessner, M.D., testified that ABMT "is currently one of the techniques that is being utilized to enable patients to tolerate higher doses of treatment and recover from that treatment."

During his examination Dr. Lessner was asked whether there was sufficient data to support the use of ABMT for multiple myeloma. He answered in the negative, basing his opinion, as Dr. Plocher did, on the fact that the Barlogie and Cheson articles provided insufficient data to make a determination. There is no evidence that Dr. Lessner examined any other data on the question, and once again, assuming that the published medical literature to date is inadequate to support the treatment, that is not the test of coverage under the Medical Plan at issue in this case. It is not determinative of the pertinent question whether ABMT is commonly and customarily recognized.

The testimony of Dr. Davis and of Dr. Wingard establishes that ABMT treatment for multiple myeloma is commonly and customarily recognized throughout Dr. Wingard's profession, i.e., those administering ABMT treatment.

Dr. Davis had personal knowledge about ABMT treatment, including such treatment for multiple myeloma both in this country and in Europe. He recommended it for plaintiff.

ABMT treatment is a team effort and is administered at centers throughout the United States, including Johns Hopkins, the University of California at San Francisco, the University of Washington, the M.D. Anderson Hospital, the Farber Cancer Center and Harvard University Institution. All of them utilize high-dose chemotherapy with ABMT for multiple myeloma. Surely that supports Dr. Wingard's opinion that, regardless of the state of the literature, ABMT treatment for multiple myeloma is commonly and customarily recognized by oncologists. It is a situation, not uncommon in cancer therapy where it takes time for literature to catch up with accepted practice and what doctors are actually doing.

Thus if there is a de novo review in this case, the evidence compels the conclusion that the proposed ABMT treatment of plaintiff's multiple myeloma is commonly and customarily recognized through the doctor's profession as appropriate and that it is not educational or experimental.

Were the abuse of discretion standard applicable, it is a situation where both Prudential and Crum and Forster have a direct and conflicting interest in the determination of coverage. Prudential is not merely the impartial, disinterested administrator of Crum and Forster's Plan, as it purports to be. Its determination apparently is one which controls payments under its own medical policies. While increased cost to the Crum and Forster Plan are to some extent passed on to employees, Crum and Forster also has a financial interest at stake.

Regardless of the potential or actual conflict of interest, Prudential did not apply the Plan's exclusionary language when it decided against coverage. As noted above it applied a different exclusion having different criteria from the Plan's exclusion. That was a clear abuse of discretion.

Plaintiff is likely to succeed on the merits.

Weighing the various equities presents no difficulties.

If a preliminary injunction is not granted, ultimate relief for plaintiff will come too late. The procedure must be administered promptly or his physical condition will deteriorate to a point where treatment will be impossible. Failure to provide treatment will probably result in death in a matter of months. If he receives treatment it is likely that his life span will be substantially extended.

Prudential would suffer no adverse effect if the preliminary injunction were granted. It is merely the administrator of the Plan. The exclusionary language of its own policies apparently is different from that of the instant Plan. Therefore the decision in this case may have no bearing on interpretation of its own policies. Crum and Forster and the Plan itself would be subjected to an additional payment. In the scheme of medical costs this one is certainly significant, but it is not beyond the kind of costs which medical plans occasionally meet. The condition is a rare one; so this result is not likely to result in a flood of similar cases.

If the cost of the treatment is properly covered under the Plan, as I think it is, the public's interest is in seeing that plaintiff receives the benefits to which he is entitled.

Thus the equities weigh heavily in favor of granting a preliminary injunction.

A preliminary injunction will issue forthwith to the following effect:

1. Defendants shall cease rejecting coverage under the Crum and Forster Medical Plan for ABMT treatment of plaintiff's multiple myeloma at the Johns Hopkins Medical Center, and.

2. Defendants shall each advise Johns Hopkins Medical Center forthwith that ABMT treatment of plaintiff's multiple myeloma at Johns Hopkins is covered by the Plan.

Normally a bond must be posted on the issuance of a preliminary injunction. However, in the present case plaintiff does not have of the funds or assets to obtain a bond in a substantial amount. To require a bond would have the effect of defeating the relief granted. Therefore no bond will be required.

Plaintiff seeks attorney's fees and costs. That question will not be dealt with at this time. Plaintiff may apply for fees and costs by motion. His moving papers should include an affidavit of attorneys services and disbursements.

Plaintiff's attorney is requested to submit an appropriate form of order implementing this opinion. However, the injunctive provisions become effective upon the reading of this opinion into the record and are to be implemented by noon, May 8, 1989.