Louis MARRO, Plaintiff,

v.

K–III COMMUNICATIONS CORPORATION,
Defendant.

No. 96 CV 4836 (NG).

United States District Court,
E.D. New York.

Oct. 7, 1996.

Scott G. Goldfinger, New York City, for plaintiff.

Wm. Lee Kinnally, Jr., Gibney Anthony & Flaherty, LLP, New York City, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

### I.

### FACTS AND PROCEEDINGS

Plaintiff suffers from a form of brain cancer. According to his treating physicians, his chances for long term survival are minimal without immediate treatment using high dosage chemotherapy. The chemotherapy proposed by Plaintiff's physicians requires autologous bone marrow transplantation with peripheral stem cell support.

The issue between Plaintiff and Defendant involves payment for the chemotherapy drugs needed for the recommended treatment. Plaintiff is an insured participant and beneficiary of a benefits plan funded by Defendant, who is Plaintiff's employer. Defendant contracts with the Prudential Life Insurance Company of America (Prudential) for claims administration of its Plan.

It is undisputed that Defendant's plan is subject to the Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. §§ 1001 et seq. Thus, Plaintiff may challenge Defendant's denial of coverage for the recommended treatment under 29 U.S.C. § 1132(a)(1)(B), which provides that a civil action may be brought by such a beneficiary

> to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

*See* 29 U.S.C.A. § 1132(a)(1)(B) (West 1985); *see also Kulakowski v. Rochester Hosp. Serv. Corp.,* 779 F.Supp. 710, 715–16 (W.D.N.Y. 1991).

Plaintiff moves for preliminary relief requiring that his proposed treatment, high dosage chemotherapy in conjunction with autologous bone marrow transplantation with peripheral stem cell support, be precertified for benefits. In opposition to the motion for a preliminary injunction, Defendant has not disputed that Prudential acts as its agent in making coverage determinations regarding requests for benefits.

On August 23, 1996, Prudential denied Plaintiff's application for precertification for high dosage chemotherapy. As grounds for its denial, Prudential stated, "We are unable to precertify this procedure which we consider not medically necessary and investigational, since such treatment is not yet recognized as safe and effective therapy for the diagnosis." Defendant's plan specifies that it does not cover charges which are "experimental" or "investigational"; and it defines those terms as follows:

> "Experimental" and "Investigational" mean that the medical use of a service or supply is still under study and the service or supply is not yet recognized throughout the Doctor's profession in the United

States as safe and effective for diagnosis or treatment.

Plaintiff promptly appealed the denial of coverage. On September 9, 1996, Prudential denied his appeal, in part because it concluded that he had a low grade neoplasm. Plaintiff's treating physician then informed Prudential that, although Plaintiff had initially been diagnosed with a low grade neoplasm, he had later developed a high grade glioma. Plaintiff's attorney also submitted to Prudential a report from Plaintiff's physician referring to studies establishing the effectiveness of the proposed treatment, as well as copies of various medical studies on the use of autologous bone marrow transplants in the treatment of cancer. In addition, Plaintiff's attorney listed for Prudential the names and telephone numbers of eleven physicians from prominent medical establishments across the country who would attest to the acceptance of the recommended treatment.

After Prudential failed to respond, Plaintiff, on October 2, 1996, submitted a proposed order to show cause seeking a preliminary injunction. After reviewing the proposed order to show cause, I directed Plaintiff's counsel to notify Defendant that a conference would be held regarding scheduling. Counsel appeared on October 3, 1996. Since, according to Plaintiff's papers, a decision was required by Monday, October 7, 1996, I advised counsel that I could conduct an evidentiary hearing over the weekend. Defendant's counsel reported that Defendant's doctors were out of state and their availability unknown. I suggested, given the exigencies of the situation, the possibility of proceeding by way of affidavits and asked counsel to confer regarding scheduling. Later that day, counsel returned to court with the following agreed upon schedule, which I approved: Defendant would submit its affidavits and brief by 5 p.m. on Friday, October 4, 1996, and Plaintiff would submit any reply papers by 9 a.m. on Monday, October 7, 1996. I scheduled oral argument for 11 a.m. on Monday the 7th.

Defendant timely filed its papers. However, the papers consisted of a brief, an affidavit by Gary Weidy, Defendant's Vice President of Due Diligence and Benefits, relating facts said to establish an absence of conflict of interest in the decision-making process, and an affidavit from Dr. Nancy Czarnecki, a Senior Medical Director of Prudential who is head of the department which performs the precertification process for Prudential. Although Dr. Czarnecki attached various supporting papers including letters to Prudential from two outside doctors whose opinions Prudential relied upon in denying precertification, Defendant has not submitted an affidavit from either of these doctors, nor has Defendant indicated that it attempted to obtain affidavits from these doctors.

## II.

## ANALYSIS

### A. *Preliminary Injunction Standard*

■ Because Plaintiff requests a preliminary injunction that would give him all the relief he seeks, and that relief is unlikely to be undone even if Defendant prevails at a trial on the merits, Plaintiff must meet a particularly high standard to prevail on his application for a preliminary injunction. *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). First, he must make a strong showing that he will suffer irreparable harm if he is not granted the preliminary injunction. *See Pazer v. New York State Bd. of Law Examiners*, 849 F.Supp. 284, 286 (S.D.N.Y. 1994) (citing *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir.1981)). Moreover, Plaintiff must show a substantial likelihood of success on the merits. *See id.* (citing *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.1988).)

### B. *Applying the Standard*

#### 1. *Prong 1: Strong Showing of Irreparable Harm*

It is indisputable that Plaintiff will suffer irreparable harm if the preliminary injunction does not issue. The affidavits of two of his treating physicians—one a highly credentialed oncologist and the other an equally well credentialed neuro-oncologist—establish that immediate treatment with high dosage chemotherapy represents 51–year–old Plaintiff's only chance for long-term survival.

Both physicians also confirm that if Plaintiff does not receive this treatment on October 7, 1996, or as close to that date as possible, then his window of opportunity to receive the treatment will close. Finally, Plaintiff has established that he is unable to afford the treatment without coverage by Defendant, and that the hospital will refuse to provide the high dosage chemotherapy without either a precertification of benefits from Defendant or a showing that Plaintiff can afford the treatment without coverage. The issuance of an injunction compelling Defendant to precertify coverage, then, is literally a matter of life or death for Plaintiff; and he has successfully made a strong showing that he will suffer irreparable harm if his motion for a preliminary injunction is not granted.

### 2. Prong 2: Substantial Likelihood of Success on the Merits

As I discussed earlier, Plaintiff must also establish a substantial likelihood of success on the merits. This prong of the preliminary injunction analysis requires an examination of Defendant's decision denying Plaintiff coverage.

#### a. Standard of Review

■ Under *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), this Court reviews de novo the denial of benefits under an ERISA-regulated plan unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If a plan provides the administrator or fiduciary with discretionary authority, then a denial of benefits may be reversed only if the administrator or fiduciary's decision was arbitrary and capricious. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir.1995).

Plaintiff has shown a substantial likelihood that, when this case is decided on the merits, a de novo standard of review will apply, because the language of the plan does not reserve discretionary authority. In attempting to argue the contrary, Defendant emphasizes the following language in the plan:

> To be considered "needed," a service or supply must be determined by Prudential to meet all of these tests:

> (a) It is ordered by a Doctor.

> (b) It is recognized throughout the Doctor's profession as safe and effective, is required for the diagnosis or treatment of the particular Sickness or Injury, and is employed appropriately in a manner and setting consistent with generally accepted United States medical standards.

> (c) It is neither Educational nor Experimental or Investigational in nature.

•  •  •  •  •

As is clear from the language defining "Experimental or Investigational," *see supra* pp. 248–49, that definition also contains no reference to any discretionary authority on the part of Prudential.

The language relied upon by Defendant is likely to be held insufficient to establish the type of discretionary authority described in *Firestone*, as it "does not ... expressly confer upon [Prudential] the power to interpret or construe the terms or provisions of the Plan, nor does it state that [Prudential's] eligibility determinations are to be given deference." *Rovira v. AT & T*, 817 F.Supp. 1062, 1069 (S.D.N.Y.1993). The K–III Plan simply specifies that Prudential will evaluate claims made by beneficiaries; it does not contain the kind of language that the Second Circuit has determined sufficient to establish deferential review. *Cf., e.g., Jordan v. Retirement Committee of Rensselaer Polytechnic Institute*, 46 F.3d 1264, 1270 (2d Cir. 1995) (approving application of arbitrary and capricious standard of review to (1) plan giving trustees the power "to construe the provisions of this Trust Agreement and the Plan"; and (2) plan granting trustees "authority to interpret the Plan and ... determine all questions arising in the administration, interpretation and application of the Plan").

Put differently, the K–III Plan simply designates Prudential as the party that decides whether a service or supply is "needed"; it does not confer upon Prudential any power of interpretation. *See id.; see also Scalamandre v. Oxford Health Plans (N.Y.), Inc.*, 823 F.Supp. 1050, 1059 (E.D.N.Y.1993) ("In contrast [to cases which received deferential review], in the case at bar [Defendant] has

proffered no provision ... that gives [it] explicit discretion to construe the insurance contract."). As the Second Circuit has emphasized, plan administrators have the ability to protect themselves by including provisions that give them discretionary authority to interpret the terms of the plan. *See Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 103 (2d Cir.1991). The K–III Plan contains no such provision.

■ Moreover, to the extent that the Plan is ambiguous as to whether it confers discretionary authority, such ambiguities must be construed against the administrator and in favor of the party seeking judicial review. *See id.* at 107 (applying to ERISA insurance plan rule of contract interpretation that ambiguities in insurance policies are construed against insurer and in favor of insured); *see also Scalamandre*, 823 F.Supp. at 1059; *Rovira*, 817 F.Supp. at 1068.

For the foregoing reasons, I conclude that Prudential's decision to deny coverage to Plaintiff is likely to be reviewed de novo.

b. *Evaluating the Denial of Benefits*

(1) *The Parties' Affidavits*

Having determined the applicable standard of review, I now examine Prudential's decision denying Plaintiff coverage. Before me are two affidavits from Plaintiff's treating physicians, both attesting that the proposed treatment is safe and effective, and that it represents Plaintiff's best option for survival.

By contrast, Defendant has submitted no affidavits from the doctors who evaluated Plaintiff's claim and advised Prudential that the proposed treatment was experimental or investigational. In fact, the only medical affidavit submitted by Defendant is the declaration of Dr. Nancy Czarnecki, who played no role in the medical determination of whether or not the proposed treatment is experimental or investigational. Admittedly, the time available for preparation of Defendant's affidavits was short; nevertheless, its papers in no way indicate that it attempted to reach the doctors upon whose views it relies and obtain their affidavits.

In lieu of such affidavits, Defendant offers the letters that the doctors forwarded to Prudential, advising Prudential to deny Plaintiff's claim. The names of the authors of those letters, however, have been deleted. In fact, the doctors are never identified· in Defendant's papers, although Defendant has provided limited data on the doctors' backgrounds. Thus, Plaintiff must endeavor to counter the contentions of unidentified doctors. (Indeed, until he brought his claim to this court, Plaintiff was not provided with the letters of those doctors—anonymous or otherwise—setting forth the grounds for their conclusion that the recommended treatment is experimental or investigational.)

In sum, whatever the rationale for Prudential's internal use of anonymous doctors, I must now weigh the sworn affidavits of two recognized experts against the unsworn statements of two anonymous· doctors.

(2) *Success on the Merits*

Even taking the letters from Defendant's doctors at face value, Plaintiff has shown a substantial likelihood that he can establish on the merits that Defendant erred in denying him coverage on the grounds that the proposed treatment is "not medically necessary and investigational, since such treatment is not yet recognized as safe and effective therapy for the diagnosis."

In sworn affidavits, Plaintiff's treating physicians maintain that high dosage chemotherapy is in fact a safe and effective therapy for Plaintiff, and that it is the only safe alternative that holds out any realistic possibility for his long-term survival. Dr. Tauseef Ahmed, Plaintiff's oncologist, states:

As a medical oncologist practicing and teaching oncology in New York, I am generally familiar with what is considered by New York cancer specialists to be appropriate care for the treatment of cancer, including· high grade gliomas. I am also aware of the opinion of this treatment held by oncologists· regionally and nationally. It is my firm opinion that high dose chemotherapy with peripheral stem cell support is generally regarded as a safe, effective and appropriate therapeutic option ·by oncologists in New York, nationally, and internationally. Neither I nor the cancer specialists at St. Agnes Hospital, with whom I am familiar, feel that this therapy

is experimental or investigative in nature. I have recommended this treatment option to my patients who are suitable candidates and am aware of many situations in which my colleagues have recommended this treatment.

Likewise, Dr. Michael L. Gruber, Plaintiff's neuro-oncologist, attests, "I am ... aware that Prudential has denied benefits for this treatment on the basis that it is 'not yet recognized as safe and effective therapy for this diagnosis.' This is ... untrue. As stated above, the community of neuro-oncologists who treat patients such as Mr. Marro are of the opinion that this is the state of the art treatment for recurrent high grade gliomas, especially where patients have already demonstrated a response to chemotherapy."

Both of Plaintiff's treating physicians also emphasize that, because of his exceptionally strong responsiveness to low dosage chemotherapy, Plaintiff is an unusually strong candidate for the recommended high dosage chemotherapy. In the words of Dr. Gruber, "In my years of practice, I have not seen a more ideal candidate for this treatment than Mr. Marro."

In addition to the affidavits of the two treating physicians, Plaintiff has submitted a letter that he sent to Prudential before the filing of this motion, in which he provided Prudential with the names and telephone numbers of eleven physicians from prominent medical establishments across the country who would attest to the safety and effectiveness of the recommended treatment.

Prudential does not assert that it ever attempted to contact any of those physicians. Instead, it relies on the recommendations of the two anonymous doctors mentioned earlier. Prudential received two rounds of letters from those doctors. In the first round, the doctors relied on their understanding that Plaintiff suffered from a low-grade neoplasm, rather than a high grade glioma. After Plaintiff's treating physicians clarified that Plaintiff's tumor had in fact progressed to a high grade glioma, the anonymous doctors again issued letters concluding that the proposed treatment is not recognized as safe and effective.

Even apart from the unsworn and anonymous nature of these reports, several aspects of the reports render them less persuasive than Plaintiff's evidence. First, as previously noted, Defendant has provided only limited biographical data about the anonymous doctors. Second, both anonymous doctors acknowledge that the individual characteristics of a patient might affect their evaluation of whether the recommended treatment is recognized as safe and effective, yet they fail to assess Plaintiff's claim in this light. For example, one of Defendant's doctors acknowledges that "there are reports of favorable responses [to the recommended treatment] from single institutions in highly selected patients." Nevertheless, the doctor fails to address the fact that Plaintiff *is* a "highly selected patient" in the evaluation of his treating physicians.

■ Finally, I note that the record before me reflects disagreement over whether the medical literature supports Plaintiff or Defendant on the question of the status and efficacy of the recommended treatment. But even if, after a trial, the literature is found to be lacking in definitive support for the treatment, that would not be conclusive. "While it is true that a lack of peer reviewed medical literature might constitute some evidence of nonrecognition of the therapy throughout a doctor's profession, it is certainly not conclusive evidence." *Dozsa v. Crum & Forster Insurance Co.*, 716 F.Supp. 131, 138 (D.N.J. 1989). For purposes of this motion, it is significant that, while the anonymous doctors relied heavily on the medical literature in determining whether the proposed treatment is recognized as safe and effective, Plaintiff's treating physicians cite not only the literature, but also the practice of their colleagues in support of their conclusion that the recommended treatment is recognized as safe and effective. *See supra* pp. 251–52. Thus, as found in *Dozsa*, that the treatment is commonly used and recognized by oncologists is relevant, even though it may take "time for literature to catch up with accepted practice and what doctors are actually doing." 716 F.Supp. at 139. K–III's Plan does not require that the safety and effectiveness of a procedure be documented in relevant literature; it only requires that the procedure be

"recognized throughout the Doctor's profession in the United States as safe and effective for diagnosis or treatment."

In sum, on the record before me, Plaintiff has shown a substantial likelihood of success on the merits.

\* \* \* \* \* \*

Finally, even were the deferential arbitrary and capricious standard to be applied, Plaintiff would still be able to show a substantial likelihood of success on the merits. To begin with, the standard would have to be applied with the added consideration that Prudential's decision-making is infected with a conflict of interest. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is· operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.") (internal quotations omitted). Defendant, either directly or through its agent Prudential, has a conflict of interest in the determination of coverage. In an effort to establish that there is no such conflict in the Defendant, Gary Weidy, Defendant's Vice President of Due Diligence and Benefits, in his affidavit, states that Defendant "absorbs the coverage for the first $100,000 in claims for each employee per policy year while Prudential is responsible for all costs that exceed the $100,000 threshold" and that, since Plaintiff has received over $100,000 in 1996, "K–III has no immediate financial interest in the determination of this claim." But since Prudential is K–III's agent, it is unlikely that K–III can avoid a finding of conflict of interest by pointing to Prudential as the party with a financial interest.

Defendant attempts to show that Prudential has no conflict of interest by arguing that, "in order to diffuse any claims by the insured of a conflict of interest that may be perceived to exist within-house [sic] reviewers," Prudential uses an outside organization, the "Ombudsman Program," which provides it with independent experts who are not selected by Prudential. Czarnecki Afft. ¶ 9. However, it is noteworthy that these reviewers are used for "high-technology, high-risk, *high-cost* medical procedures." *Id.* (emphasis added) and that Prudential retains the right to reject the views of the doctors provided under the Ombudsman Program. Brief of Defendant, n. 3. Under the facts presented by Defendant, it is unlikely that Defendant will be found free of financial conflict in the making of the coverage determination at issue.[1]

On the record before me, I conclude that Plaintiff is likely to succeed in establishing that Prudential's rejection of the evidence supplied by Plaintiff's treating doctors as to the efficacy and non-experimental nature of the treatment being offered to Plaintiff was arbitrary and capricious.

## III.

### CONCLUSION

For the aforementioned reasons, I have determined (1) that Plaintiff will suffer irreparable harm if he is not granted a preliminary injunction, and (2) that there is a substantial likelihood that he will succeed on the merits in establishing that Defendant erred in denying him coverage for the high dosage chemotherapy. Accordingly, his motion for a preliminary injunction requiring Defendant to precertify the recommended treatment is hereby granted. *See, e.g. Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571 (N.D.N.Y. 1993) (granting preliminary injunction requiring coverage for high dose chemotherapy with autologous bone marrow transplantation treatment for patient with breast cancer);

---

1. Defendant's effort to counteract its own conflict of interest by questioning the integrity of Plaintiff's doctors is unavailing. Defendant argues that Plaintiff's doctors are "not free from conflicts, since both are investigators for a study of precisely the procedure at issue here.... Insurance coverage for the procedure would allow them to continue their study, as well as treat their patient, at The Prudential's expense." Czarnecki Afft. n. 1. But that Plaintiff's doctors are studying the procedure and are admittedly interested in obtaining for their patient the treatment that they have concluded he needs is not equivalent to the financial conflict of interest found significant in fiduciaries and administrators. Moreover, Defendant's ability to argue about the integrity of Plaintiff's doctors points up the inability of Plaintiff, or the Court, to assess the integrity of Defendant's anonymous doctors.

*White v. Caterpillar, Inc.,* 765 F.Supp. 1418 (W.D.Mo.1991) (same), *aff'd without opinion,* 985 F.2d 564 (8th Cir.1991); *Kulakowski v. Rochester Hospital Service Corp.,* 779 F.Supp. 710 (W.D.N.Y.1991) (same).

Although Rule 65(c) of the Federal Rules of Civil Procedure requires the Court granting a preliminary injunction to consider the imposition of a bond as security for the injunction, under the unusual and exigent circumstances presented, where the requirement of a bond could defeat the very relief afforded by the injunction, in the exercise of my discretion, no bond will be required. *See White,* 765 F.Supp. at 1424; *Dozsa,* 716 F.Supp. at 139–40.

SO ORDERED.

### PRELIMINARY INJUNCTION

For the reasons stated in an Opinion and Order issued this day, it is hereby ORDERED that plaintiff's Motion for Preliminary Injunction is GRANTED, that defendant or its agent Prudential immediately provide precertification to plaintiff's health care providers that benefits are available under the medical benefits plan at issue for autologous bone marrow transplantation and high dosage chemotherapy, and that defendant or its agent Prudential authorize and provide those benefits pending a trial on the merits. The Court exercises its discretion in dispensing with the requirement for a bond.