**Rebecca KULAKOWSKI, Plaintiff,**

v.

**ROCHESTER HOSPITAL SERVICE CORPORATION and Genesee Valley Medical Care, Inc., d/b/a "Blue Choice", Defendants.**

**No. CIV–91–6505T.**

United States District Court, W.D. New York.

Dec. 17, 1991.

---

Robert B. Koegel, Ernstrom & Estes, Rochester, N.Y., for plaintiff.

William L. Dorr, Harris Beach & Wilcox, Rochester, N.Y., for defendants.

## DECISION AND ORDER

TELESCA, Chief Judge.

### INTRODUCTION

The plaintiff Rebecca Kulakowski ("Mrs. Kulakowski") is a 34–year old woman who suffers from metastatic breast cancer. In late October 1991, Mrs. Kulakowski requested pre-approval from defendants (collectively, "Blue Choice") for a course of treatment for her cancer which involves the combined use of high doses of chemotherapy and an autologous bone marrow transplant ("HDC/ABMT"). Several weeks later, her request was denied. She then commenced this action pursuant to 29 U.S.C. § 1132(a)(1)(B) [1], seeking to enforce

---

1. The civil enforcement provision of the Employee Retirement Income Security Act of 1974 ("ERISA").

her rights as a beneficiary of a health insurance plan administered by Blue Choice.

Presently before me is Mrs. Kulakowski's motion for a preliminary injunction to require Blue Choice to pay for her HDC/ABMT treatment. A hearing on the motion was held Wednesday, December 11, 1991, and written final submissions were filed Friday, December 13, 1991. For the reasons discussed below, plaintiff's motion for a preliminary injunction is granted.

## FACTS

Mrs. Kulakowski is a covered beneficiary under a health care and hospitalization insurance plan issued by Blue Choice and maintained by her husband's employer. The terms of this plan are contained in a written contract (the "Contract") which is annexed to the complaint. As discussed in more detail below, in relevant part the Contract expressly excludes coverage for "experimental procedures [2]."

Mrs. Kulakowski's cancer was first discovered in February 1989. She underwent a left mastectomy in April 1989; chemotherapy and radiation therapy followed, through January 1990, when she achieved a remission. Her remission ended in the summer of 1991 and in the fall of 1991, a swollen lymph node was removed from Mrs. Kulakowski's neck. Her treating oncologist, Dr. James Rooney, diagnosed metastatic breast cancer and referred Mrs. Kulakowski to Dr. John DiPersio, the Director of the Bone Marrow Transplant Clinic (the "Clinic") at Strong Memorial Hospital, Rochester, New York.

The Clinic specializes in providing HDC/ABMT treatment to cancer patients. HDC/ABMT is a procedure by which bone marrow stem cells are extracted ("harvested") from the patient's body and frozen in storage while the patient receives massive doses of chemotherapy to destroy the cancer. Such doses, although universally acknowledged as more effective in destroying cancer cells, would be fatally toxic to bone marrow left in place during the course of chemotherapy. After the chemotherapy is completed, the patient's own bone marrow is reintroduced into his system.

HDC/ABMT was first used to treat a number of other types of cancer, including leukemia, lymphoma, and Hodgkins Disease (a form of lymphoma). Many health care insurance providers, including Blue Choice, provide coverage for HDC/ABMT for lymphomas, leukemia, and neuroblastoma. While the application of HDC/ABMT in cases of breast cancer is a more recently developed treatment, many other health care insurers, including major insurers in the Western New York area, *do* provide coverage for such treatment.

When Dr. Rooney recommended that Mrs. Kulakowski seek treatment at the Clinic, he was intimately familiar with her condition and the treatments she had already undergone. Before accepting her as a patient at the Clinic, Dr. DiPersio both reviewed Mrs. Kulakowski's medical records and examined her personally. Both Dr. Rooney and Dr. DiPersio have stated that HDC/ABMT offers Mrs. Kulakowski the best chance of achieving and maintaining remission from her present cancer and her *only* chance of a "long-term" remission, which is the medical euphemism for a cure for a disease with a miserably low cure rate. In opening argument, plaintiff's counsel stated that breast cancer will strike one out of every nine American women and that 45,000 American women die from it each year.

After reviewing her medical history, Dr. DiPersio informed Mrs. Kulakowski that she is an "excellent" candidate for HDC/ABMT because of her present condition:

---

**2.** Section 7, para. 11 of the Contract states:
**Experimental Procedure**
We will not provide benefits for any procedure or service which, in the sole judgment of the Blue Choice Medical Director, is experimental in nature. In addition, we will not provide benefits for medical treatments or procedures not proven to be safe and efficacious; nor will we provide benefits for ineffective or experimental surgical or medical treatments, or procedures, research studies or other experimental health care procedures under continued scientific testing and research with questions, in the sole judgment of the Blue Choice Medical Director, as to safety and efficacy.

she is generally very healthy and, with the removal of the cancerous lymph node, she seems to have very little/no other cancer tumors present. Dr. DiPersio has advised Mrs. Kulakowski that she should begin the treatment as soon as practicable and has, in the meantime, begun a regimen of radiotherapy to maintain her condition.

The cost of HDC/ABMT at the Clinic currently averages $92,000. Before it will commence the treatment, the Clinic requires either substantial payment or a letter from the patient's health insurer indicating that coverage will be provided. In a letter dated October 17, 1991, Dr. DiPersio formally requested authorization and pre-certification for a course of treatment ("protocol") for Mrs. Kulakowski at the Clinic which included both chemotherapy and an autologous bone marrow transplant—that is, he sought assurances that Blue Choice would cover Mrs. Kulakowski's HDC/ABMT.

In November 1991, Blue Choice denied coverage to Mrs. Kulakowski. The denial came in an 8–page letter from the Medical Director of Blue Choice, Dr. Joseph Stankaitis. Dr. Stankaitis had never seen or examined Mrs. Kulakowski, but based on a review of both her records and applicable medical literature, he opined that HDC/ABMT as proposed for her would be "experimental" and, therefore, excluded from coverage under the Contract. After reviewing the steps which Blue Choice had taken in making its decision to deny coverage, Dr. Stankaitis stated to Mrs. Kulakowski:

> We have concluded that although the treatment offered to you may be promising in view of the alternatives currently available to you, autologous bone marrow transplantation for metastatic breast cancer is, at this time, under continued scientific testing and research, with questions as to its safety and efficacy.

With respect to the "alternatives" currently available to Mrs. Kulakowski, both Dr. DiPersio and Dr. Rooney had told her that, without HDC/ABMT, she will die, either very quickly if she elected no treatment or after a matter of months if she elected conventional chemotherapy, and those months to be spent dealing with the side effects of conventional chemotherapy which, in the equally euphemistic terms of several of the doctors who testified at the hearing on this motion, are devastating to the patient's "quality of life." At the hearing on this motion, plaintiff presented the testimony of Dr. DiPersio as both a treating physician and an expert; defendants presented the testimony of Dr. Stankaitis, over whose signature the denial letter was issued; the testimony of Dr. Marvin Hoffman, currently a Vice–President for Medical Affairs of Blue Cross/Blue Shield of the Rochester area, who, while neither an expert in oncology or hematology or any other related field nor a currently practicing physician, has, in his corporate capacity, attended a number of medical seminars in the recent past, including one sponsored by the University of Chicago Medical School on breast cancer and ABMT; Elaine Ritter Schaffer, a registered nurse who, in her capacity as Medical Affairs Administrator of Blue Choice, requested Mrs. Kulakowski's medical records from the Clinic; and Dr. Richard Cooper, an oncologist recognized for his particular expertise in the field of breast cancer.

Dr. DiPersio stated that, prior to taking his present position at the Clinic, he had personally performed several hundred bone marrow transplants. He is board certified in both oncology and hematology. As Director of the Clinic, he oversees the treatment and progress of all patients; he also participates in both clinical and basic research. In the past year, he has had over 100 patients, eight of whom suffered from metastatic breast cancer. Dr. DiPersio defined "metastatic" as cancer which is either recurring (in the same site) or spreading. He has ten more patients with such cancer who are waiting to begin HDC/ABMT treatment.

Dr. DiPersio explained that the rationale of HDC/ABMT, in the treatment of breast cancer as in other cancers, is that the higher the dose of conventional chemotherapy, the greater "response" it causes. "Response" measures the reduction in disease;

a "significant response" would indicate a 50% reduction in disease; a "complete response" would indicate a 100% reduction in disease. Because, however, some treatments reduce disease but kill the patient, a treatment must be evaluated in terms of both response and Patient Quality of Life ("PQL"). PQL takes into account not only the results of a treatment, including the prolongation of life, but also the way in which it affects a patient during treatment by weakness, nausea, disfigurement, extended hospitalization, etc. An analysis of a treatment for its response and PQL in turn determines the "efficacy" of such treatment.

Dr. DiPersio admitted that most oncologic treatment is not curative; it is merely efficacious, aimed at reducing disease as much as possible while maintaining the highest level of quality of life. Dr. DiPersio stated that the *efficacy* of conventional chemotherapy in the treatment of patients like Mrs. Kulakowski with advanced, metastatic breast cancer is not disputed. It is equally undisputed that such treatment will not cure her; that conventional chemotherapy presents Mrs. Kulakowski with a treatment regimen which will require extended and repeated hospital stays and visits, will present her with an array of side effects, including nausea and weakness, and which will, some months or perhaps even a few years down the road, cease to be effective until her cancer "overwhelms" her and she dies.

Dr. DiPersio stated that HDC/ABMT is equally, if not more, efficacious, in the treatment of Mrs. Kulakowski's cancer. Treatment with HDC/ABMT would just as likely, if not more likely, lead to a remission of her cancer; the treatment would involve significantly less hospitalization and a shortened term of chemotherapy with its unavoidable side effects. Dr. DiPersio estimated, based on research results currently reported in the medical literature, that, in achieving a remission in metastatic breast cancer, conventional chemotherapy is 30–60% effective and HDC/ABMT is 70–90% effective. Dr. DiPersio admitted that the toxicity connected with high dose chemotherapy involves some risk of death,

but that such risk has been reduced from 20% under older HDC/ABMT protocols to 3–5% under newer treatment methods. He acknowledged that there are also questions of safety and toxicity about conventional chemotherapy (slightly lower than for HDC/ABMT), and that protocols for both types of treatment are continually subject to change. Dr. DiPersio defined a protocol as a treatment regimen set up for an individual patient whose medical outlook, given any other available courses of treatment, is dismal, and effectively disputed that a protocol is necessarily experimental.

With respect to Mrs. Kulakowski's treatment, Dr. DiPersio stated that her history and present condition make her a "good candidate" for HDC/ABMT; she is young, strong, otherwise healthy, and presently presents with minimal disease. He also stated that the decision to transplant Mrs. Kulakowski is not irreversible; if, after receiving high dose chemotherapy she did not remain medically stable, she would not be transplanted.

According to Dr. DiPersio, Mrs. Kulakowski is presently faced with three treatment options: She may elect no further treatment, in which case her disease will progress quickly; or she may elect conventional chemotherapy, which will result in a slower but inexorable progression of her disease; or, if coverage is available to her under the Contract, she may elect HDC/ABMT, which will, in all likelihood, *at least* match the efficacy of conventional chemotherapy, *may* exceed its efficacy, and *may* offer a chance for a cure. Of these three options, *only* HDC/ABMT offers any hope of a cure; only HDC/ABMT offers a treatment which may both extend the span of Rebecca Kulakowski's life and ensure a modicum of comfort to the time allotted to her.

Dr. Richard Cooper was defendants' first witness. A medical oncologist, Dr. Cooper is a member of the faculty of the University of Buffalo Medical School; 95% of his practice concerns the treatment of patients with metastatic breast cancer. Dr. Cooper had never seen Mrs. Kulakowski, or examined her records. He had, however, spoken

to Dr. Stankaitis, in the past, about the use of ABMT in connection with the treatment of breast cancer. It was Dr. Cooper's expert opinion that the use of HDC/ABMT in connection with breast cancer is investigational, *but not* experimental. He also rendered his expert opinion that HDC/ABMT and conventional chemotherapy are *equally efficacious* in the treatment of such cancer. Dr. Cooper acknowledged that there has been "no significant change" in the longterm prognosis for metastatic breast cancer over the last decade and that, even in the treatment program using the most aggressive conventional chemotherapy and having the best statistical outcome, only 9% of the patients enjoyed longterm remission. In choosing to give more weight to the opinion of Dr. DiPersio, I am persuaded by the decisions of a number of other district courts which, in considering this very issue, and relying upon expert testimony, have stated without qualification that conventional chemotherapy cannot cure metastatic breast cancer. *See, e.g., White v. Caterpillar, Inc.*, 765 F.Supp. 1418 (W.D.Mo. 1991); *Pirozzi v. Blue Cross*, 741 F.Supp. 586 (E.D.Va.1990).

Because I found much of the remainder of the testimony elicited by defendants neither remarkable nor relevant to the outcome of this motion, I will address it only summarily. Dr. Hoffman testified concerning an experimental program to provide HDC/ABMT to breast cancer patients which is currently in the final planning stages and which will be funded, in part, by health care insurers, including Blue Choice. It is undisputed that treatment under the program is not yet available and that, in any event, Mrs. Kulakowski would not be accepted into the program because of the advanced stage of her cancer. That program will only be available to Stage II and Stage III breast cancer patients; Mrs. Kulakowski suffers from Stage IV breast cancer, the most serious form recognized.

Dr. Stankaitis testified concerning the steps he took prior to declining coverage for Mrs. Kulakowski: he reviewed her records; he reviewed the literature in the field; he conferred with other Blue Choice employees; he spoke to Dr. Hoffman concerning a relevant seminar which Dr. Hoffman had attended; and he spoke to other medical doctors, including surgeons. Based on the information he received, he determined that the HDC/ABMT protocol proposed for Mrs. Kulakowski is an experimental treatment for cancer such as the plaintiff presents and is, therefore, an excluded procedure under the Contract. In making that determination, Dr. Stankaitis relied upon the "experimental" nature, not only of the combination of chemotherapy and bone marrow transplant to treat the plaintiff, but also of the drug regimen proposed by Dr. DiPersio: a previously untested combination of etoposide (VP–16), carboplatin (Cb), and intravenous L-phenylalanine mustard (L–PAM) ("Melphalon"). The defendants have, however, failed to provide any testimony, expert or otherwise, that a protocol involving the administration of such new combinations of drugs—each a recognized efficacious chemotherapeutic drug—constitutes "experimental" treatment. As the court recognized in *Pirozzi v. Blue Cross–Blue Shield*, 741 F.Supp. 586, 593 (E.D.Va.1990):

> [T]he use of protocols in connection with HDC/ABMT treatment is [not] an indication that the treatment is experimental.... ... Use of a protocol does not, by itself, indicate that a procedure is experimental. (footnote omitted) Were this not so, much of medicine might be swept within the ambit of the experimental exclusion....

Thus, I must decide, under the applicable legal standard, whether Blue Choice erred in determining that Mrs. Kulakowski's proposed treatment is experimental and therefore excluded under the Contract.

## DISCUSSION

It is undisputed that Mrs. Kulakowski is a covered beneficiary under a benefits plan which is subject to ERISA. Thus, she may challenge the denial of coverage for her HDC/ABMT treatment under 29 U.S.C. § 1132(a)(1)(B), which provides that a civil action may be brought by such a beneficiary

to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

The Supreme Court has expressly held that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a *de novo* standard

unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989).

■ In this case, the Contract expressly provides that the determination whether a procedure is experimental, and therefore, excluded, rests solely with the Medical Director. *See* fn. 2, *supra.* Thus, under *Firestone,* the denial of coverage to Mrs. Kulakowski is reviewable only to determine whether such denial was arbitrary or capricious. *See, e.g., Reichelt v. Emhart Corp.,* 921 F.2d 425, 431 (2d Cir.1990). In making that determination, I may consider the fact that Blue Choice both administers the Contract and pays for benefits under it. *Firestone,* 109 S.Ct. at 956.

■ Defendants argue that, under this standard, their denial of coverage must be upheld if it is supported by *any* rational basis. Defendants overstate the law: In order to determine whether action is arbitrary or capricious, I must

consider whether the decision was based on ... the relevant factors and whether there has been a clear error of judgment. Citations omitted. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

While the Court is proscribed from substituting its own judgment for that of Blue Choice, I am charged with making a "searching and careful" inquiry into the facts. *Id.* 91 S.Ct. at 824.

■ Blue Choice denied coverage to Mrs. Kulakowski on the basis of the experimental nature of HDC/ABMT in the treatment of metastatic breast cancer. Dr. DiPersio disputed that such a treatment protocol is experimental. *Even defendants' own expert, Dr. Cooper, denied that the procedure is experimental;* instead, he stated that it was "investigational." This Blue Choice plan does not exclude coverage for "investigational" procedures, *cf. White v. Caterpillar,* 765 F.Supp. at 1421–23 and *Rollo v. Blue Cross/Blue Shield,* 1990 WL 312647 (D.N.J.1990) (Challenges to denials of coverage for HDC/ABMT under express exclusions for "investigational" procedures.) The parties' experts not only agreed that it is well established that such a procedure *can* be used to treat metastatic breast cancer and that it is therefore *not* experimental; they also agreed that both conventional chemotherapy and HDC/ABMT are "efficacious" in the treatment of such cancers. Finally, Dr. Cooper did not seriously dispute the fact that HDC/ABMT is relatively safe, with a mortality rate less than 5%. As Dr. DiPersio stated, however, a determination whether a procedure is "safe" must take into account what alternatives the patient faces without it and where, as here, the patient will otherwise die, a greater degree of risk may still be considered "safe".

While the defendants are, indeed, entitled to a deferential review of their construction and enforcement of the Contract, a reading of the applicable exclusion denying coverage to a procedure which is *not* experimental, *not* unsafe, and *not* inefficacious, is clearly arbitrary and cannot be upheld.

My determination does not constitute an indictment of Blue Choice's conduct in this matter. This is not a case, for instance, where an insurer has "clung steadfastly to the results of a five-year old study in denying coverage[,]" *cf. White v. Caterpillar,* 765 F.Supp. at 1421. Nor is it a case where a medical director has denied coverage based on a review limited to the insurance company's *own* literature on a medical topic, *cf. Rollo v. Blue Cross/Blue Shield,* 1990 WL 312647 (D.N.J.1990), *slip op.* at 3–4. Nor does my determination question either the good faith of Blue Choice or the sincerity of their regret at denying cover-

age to Mrs. Kulakowski. I find only that "what defendants did in effect was to ignore the language of [the Contract] and to insert a new exclusion ... that no coverage would be provided for therapy which is 'investigational.'" *Dozsa*, 716 F.Supp. at 138. Such denial, under the language of *this* Contract, is a "clear error of judgment." *Overton Park*, 91 S.Ct. at 824.

 Having decided that Blue Choice's denial of coverage for HDC/ABMT to Mrs. Kulakowski was arbitrary and capricious, I must further decide whether she is entitled to a preliminary injunction.

The standard for preliminary injunctive relief in this Circuit is clearly articulated by *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70 (2d Cir.1979) and its progeny. It calls for a finding of

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Id.* at 72.

Denial of a preliminary injunction would irreparably harm Mrs. Kulakowski, because ultimate relief will likely come too late. She must receive HDC/ABMT promptly, before her physical condition deteriorates to a point where such treatment is impossible. As her medical records indicate, there is only a certain "window of opportunity" for the harvesting of Mrs. Kulakowski's bone marrow and in which she remains a good candidate for HDC/ABMT. Failure to provide this treatment—that is, relegating Mrs. Kulakowski to choosing between no treatment and conventional chemotherapy—will probably result in her death in a matter of months. Receiving the treatment may very likely both extend the span of her life and improve the quality of that life. Based on this decision and order, Mrs. Kulakowski is likely to prevail on the merits insofar as she seeks a declaration that denial of coverage was arbitrary and capricious. Based on this decision and order, and those from district courts around the country dealing

with this very issue, the propriety of denying coverage for HDC/ABMT as an "experimental" procedure certainly presents a fair ground for litigation. Finally, as Judge DeBevoise noted in deciding a similar case concerning HDC/ABMT treatment for a plaintiff suffering from a type of cancer known as multiple myeloma, "Weighing the various equities presents no difficulties." *Dozsa v. Crum & Forster Ins. Co.*, 716 F.Supp. 131, 140 (D.N.J.1989). A preliminary injunction will cost Blue Choice money; its denial would cost Mrs. Kulakowski all remaining hope, and possibly her life.

WHEREFORE, plaintiff's motion for a preliminary injunction is granted; defendants shall cease rejecting coverage under the Contract for HDC/ABMT treatment of plaintiff's breast cancer at the Bone Marrow Transplant Clinic at the University of Rochester Medical Center and shall forthwith inform Dr. John DiPersio that such treatment for the plaintiff is covered under the Contract. Given the plaintiff's inability to pay for the treatment, the posting of a bond pursuant to Fed.R.Civ.P. 65(c) would effectively defeat the relief granted. Thus, no bond will be required. *Dozsa*, 716 F.Supp. at 140.

ALL OF THE ABOVE IS SO ORDERED.