Noemi VELEZ, Plaintiff,

v.

PRUDENTIAL HEALTH CARE PLAN OF NEW YORK, INC., Defendant.

No. 96 CV 4987 (BDP).

United States District Court, S.D. New York.

Oct. 18, 1996.

---

William H. Mulligan, Bleakley, Platt & Schmidt, White Plains, NY, Douglas M. Coleman, Hudgins, Carter & Coleman, Alexandria, VA, for Plaintiff.

Peter L. Altieri, Epstein, Becker & Green, P.C., New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

Plaintiff Noemi Velez brings this action pursuant to section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (1995), seeking a determination of her right to coverage under a medical insurance plan issued by defendant Prudential Health Care Plan of New York ("Prudential") through her employer Chemical Bank.

Velez, who suffers from multiple myeloma, a rare form of cancer, alleges that Prudential wrongfully refused to precertify payment for a procedure to which she is entitled under her health insurance policy. Defendant denies that she is entitled to the coverage she seeks. Before the Court is plaintiff's motion for a preliminary injunction to require Prudential to precertify and pay for her treatment. That motion was heard on October 17, 1996. For the reasons set forth, plaintiff's motion is granted. *See* Fed.R.Civ.P. 65(a). The Court's Findings of Fact and Conclusions of Law follow.

## I. BACKGROUND

Noemi Velez suffers from stage III multiple myeloma,[1] a cancer of the blood that, although frequently fatal, can be ameliorated with chemotherapy and sometimes radiation therapy. But standard out-patient levels of chemotherapy provide only limited success in treating multiple myeloma. With conventional doses of chemotherapy, her life expectancy is approximately 30 months.

High-dose chemotherapy ("HDC") has advantages over conventional chemotherapy and results in a greater rate of success in the treatment of multiple myeloma. A limitation on HDC, however, is imposed by its side effects. As the dosage increases, so does the toxic effect on bone marrow, thus damaging and ultimately destroying it. This secondary effect, untreated, can be lethal. To avoid this result, some doctors have incorporated into treatment therapy the autologous bone marrow transplant ("ABMT") procedure, whereby bone marrow is removed from the patient before the chemotherapy begins, is frozen for preservation, and is reinfused after treatment. A patient undergoing HDC–ABMT is hospitalized—often in intensive care—for approximately 10 days of treatment and requires full medical attention.

In December 1995, plaintiff's doctors, Dr. Tauseef Ahmed, Chief of Oncology at New York Medical College and Dr. Ram Kancherla of Westchester County Medical Center

("WCMC"), determined that sequential or "tandem" administration of HDC–ABMT therapy was the best treatment for plaintiff's condition. According to Dr. Ahmed, the likelihood that patients will achieve complete remission almost doubles with tandem as opposed to single HDC–ABMT treatment. In July, Velez received her initial HDC–ABMT treatment, for which Prudential agreed to pay. This litigation arises from Prudential's failure to precertify the second or "tandem" component of Velez's HDC–ABMT treatment. Velez was and continues to be a suitable candidate for the treatment because of her youth (she is 48 years old) and the fact that her disease has been responsive to lower-dose outpatient chemotherapy. Patients like Velez, however, enjoy a limited *window* of opportunity in which they may receive the HDC–ABMT treatment with successful results.

At the time that the HDC–ABMT was suggested by her doctors, Velez, as an employee of Chemical Bank, was insured under Prudential Health Care's New York HMO Plan ("the Plan"). Thus, in March 1996, WCMC, the medical facility that was to administer the tandem HDC–ABMT, requested that Prudential precertify the treatment to guarantee payment for the procedure. On May 10, 1996, Prudential denied coverage for the treatment in writing, asserting—without any explanation or elaboration—that the treatment was "medically unnecessary." Prudential did not specify in the letter the grounds for making that determination. Weeks later, Prudential adverted to a provision in plaintiff's policy that defined "medical necessity" as satisfying, among others, the following criteria:

> (b) The prevailing opinion within the appropriate specialty of the United States medical profession is that [the treatment] is safe and effective for its intended use, and that its omission would adversely affect the person's medical condition.

Prucare[2] will determine whether these requirements have been met based on:

---

**1.** Multiple myeloma is a form of lymphocytic cancer in which there is an abnormal and uncontrolled growth of plasma cells in the bones and bone marrow.

**2.** Prucare is the d/b/a of Prudential Health Care.

- Published reports in authoritative medical literature;
- Regulations, reports, publications or evaluations issued by government agencies such as the Agency for Health Care Policy and Research, the National Institutes of Health, and the Food and Drug Administration (FDA);
- Listings in the following drug compendia: The American Medical Association Drug Evaluations, The American Hospital Formulary Service Drug Information and The United States Pharmacopeia Dispensing Information; and
- Other authoritative medical sources to the extent that PruCare determines them to be necessary.

In response to the May 10 letter, WCMC, on behalf of Velez, asked for reconsideration of the benefit denial. In a letter of June 4, 1996, Prudential again denied the request for precertification, but this time advanced a new, different, basis for denial, stating that the procedure was "experimental or investigational" and mentioning nothing of "medical necessity."

The June 4 denial offered no reasoned explanation or analysis but simply quoted from plan language that excludes experimental or investigational services where

PruCare determines that one or more of the following is true:

(a) The service or supply is under study or in a clinical trial to evaluate its toxicity, safety and efficacy for a particular diagnosis or set of indications. Clinical trials include but are not limited to phase I, II and III clinical trials.

(b) The prevailing opinion within the appropriate specialty of the United States medical professions is that the service or supply needs further evaluation for the particular diagnosis or set of indications before it is used outside clinical trials or other research settings.

PruCare will determine if this item (b) is true based on:

(i) Published reports in authoritative medical literature; and

(ii) Regulations, reports, publications and evaluations issued by government agencies such as the Agency for Health Care Policy and Research, the National Institutes of Health, and the FDA.

\* \* \* \* \* \*

(d) The provider's institutional review board acknowledges that the use of the service or supply is experimental or investigational and subject to that board's approval.

(e) The provider's institutional review board requires the patient, parent or guardian give an informed consent stating that the service or supply is experimental or investigational part of a research project or study; or federal law requires such a consent.

(f) Research protocols indicate that the service of supply is experimental or investigational or is part of a research project or study. This item (f) applies for protocols used by the patient's provider as well as protocols used by other providers studying substantially the same service or supply.

On June 21, 1996, counsel for Velez requested that Prudential reconsider the benefit denial and provided Prudential with information in support of the position that tandem HDC–ABMT is not experimental or investigational. On July 10, 1996 this second appeal was also denied, this time on the grounds that the treatment was "medically unnecessary" and "experimental/investigational."

It is noteworthy that Prudential does not assert that HDC–ABMT treatment itself is medically unnecessary or experimental under the terms of the Plan. Rather, it is the "tandem" or double-intensive nature of the treatment sought by plaintiff that defendant claims excludes the treatment from coverage under the Plan.

On July 3, when the parties appeared before this Court, Prudential agreed to pay for the cost associated with the first transplant and round of chemotherapy. Prudential reserved rights as to the second transplant and required Velez to pursue further appeals, through its administrative processes, of its continued refusal to cover the full treatment Velez's physicians have urged.

Velez has since received the first phase of the tandem transplant treatment, to which, Dr. Ahmed reports, she had a good response. Meanwhile, defendant rejected plaintiff's appeal of the benefit denial for the second round of treatment, as well as her third request for reconsideration of the benefit denial.

## II. DISCUSSION

It is undisputed that Velez is a covered beneficiary under a benefits plan which is subject to ERISA. Thus, she may challenge the denial of coverage of her tandem HDC–ABMT treatment under 29 U.S.C. § 1132(a)(1)(B). Section 1132 provides that a civil action may be brought by a beneficiary "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (1995).

The parties, as an initial matter, contest the showing required of Velez in order for her to obtain preliminary injunctive relief. The typical preliminary injunction is, of course, prohibitory, seeking only to maintain the status quo pending trial on the merits. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). It is well settled that a party seeking to obtain this relief must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Tom Doherty Associates*, 60 F.3d at 33; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2nd Cir.1979) (per curiam).

It is similarly clear that a higher standard applies where an injunction is "mandatory," that is, where it will alter rather than maintain the status quo. *Tom Doherty Associates*, 60 F.3d at 33. In such cases, the movant must make a "clear showing that the moving party is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief." *Id.* The "clear" showing requirement alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success. *Id.* Prudential argues that the preliminary injunction sought here is "mandatory," and, thus, Velez should be required to make an "extraordinary showing" of likelihood of success on the merits.

The distinction between mandatory and prohibitory injunctions is, however, "not without ambiguities." *Tom Doherty Associates*, 60 F.3d at 34. Indeed, the typical method of differentiating the two—by examining whether the moving party is being ordered to act or refrain from action—is often "more semantical than substantive." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985). Thus, "the distinction between mandatory and prohibitory injunctions ... cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset." *Id.* That is particularly so when, as here, the parties have vastly different perspectives on what constitutes the status quo. *Tom Doherty Associates*, 60 F.3d at 34.

This Court is persuaded that the injunction sought is more prohibitory than mandatory in nature. Velez claims that she is entitled to coverage under the terms of her policy and that Prudential has abridged that right by violating its contractual obligation to afford her that coverage. The relief sought is an injunction ordering Prudential to cease interference with vested contract rights, thus maintaining the situation that would prevail if the contract were properly performed. *Cf. Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.*, 815 F.Supp. 571 (N.D.N.Y.1993) (applying the prohibitory injunction standard where plaintiff sought preliminary injunction requiring insurer to provide coverage for HDC–ABMT); *Kulakowski v. Rochester Hospital Service Corp.*, 779 F.Supp. 710 (W.D.N.Y.1991) (same); *Dozsa v. Crum & Forster Insurance Co.*, 716 F.Supp. 131 (D.N.J.1989) (same). Plaintiff, therefore, need only make the less burdensome showing required of prohibitory injunctions.

■ In order to satisfy either the sufficiently serious questions or the likelihood of success bases for a preliminary injunction, plaintiff must show that she will suffer irreparable harm absent the relief sought. *Jackson Dairy*, 596 F.2d at 72; *Tom Doherty Associates*, 60 F.3d at 36. Prudential contends that Velez has failed to establish that she will suffer irreparable harm since she has not demonstrated that (1) the hospital requires a guaranty, (2) the amount of the guaranty required, or (3) that she does not have sufficient assets of her own to guaranty such payment.

In *Kekis*, the court found irreparable harm to exist where the patient would be deprived of a valuable medical treatment absent injunctive relief. "[I]nasmuch as this deprivation would permanently affect her health (although the extent of this effect is unknown), it is not the type of deprivation that could be compensated with monetary relief in the future." *Kekis*, 815 F.Supp. at 584; *see also Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958 (8th Cir.1995) (finding irreparable harm even though equally effective forms of treatment were available to the plaintiff); *Kulakowski*, 779 F.Supp. at 717; *White v. Caterpillar, Inc.*, 765 F.Supp. 1418, 1423 (W.D.Mo.1991).

The harm that is imminent in this case is Velez's substantial additional suffering and probable death. Dr. Ahmed, plaintiff's treating oncologist, has testified to the urgency of the second phase of treatment. He notes that if plaintiff "does not receive [the second phase of the] treatment soon, her disease may progress again and she will lose her opportunity to be treated." Ahmed Affidavit, ¶ 1. Without precertification, Westchester will not administer the second round of HDC–ABMT, which will cost at least $75,000. Plaintiff has testified that she lacks the financial resources to pay for treatment. Thus, this Court finds, contrary to defendant's assertions, that the evidence presented by plaintiff unquestionably demonstrates the prospect of irreparable harm.

■ Actions challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B) are subject to the standard of review announced in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Firestone*, the Supreme Court observed that "a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a de novo standard." *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956. Where, however, discretion to interpret ERISA plan terms is reserved by the plan administrator or fiduciary, courts are required to review those interpretations applying an arbitrary and capricious standard. *Id.; Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995); *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80 (4th Cir.1993); *Whitney v. Empire Blue Cross & Blue Shield*, 920 F.Supp. 477, 483 (S.D.N.Y.1996).

■ The parties agree that Prudential is the fiduciary of the Plan and that the Plan reserves the right to Prudential to determine whether or not a treatment is exempt from coverage. Specifically, the plan provides that a service or supply will be considered "both 'needed and appropriately provided' if *PruCare determines* that it meets [certain] requirements" and " 'experimental or investigational' if *PruCare determines* that one or more" of certain conditions are satisfied. The standard of review is, therefore, whether Prudential's decision to deny coverage was arbitrary and capricious.

■ *Firestone*, however, further instructs that if the plan fiduciary "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. at 957. Courts have found substantial potential for conflict to exist where a plan administrator or fiduciary serves the dual roles of a decision-maker with regard to the granting or denial of claims and an insurer "which must constantly strive to make its revenues exceed its costs." *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990); *see also O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 59 (2d Cir.1994); *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995); *Doe v. Group Hospitalization & Medical Services*, 3 F.3d

at 85–86; *Whitney v. Empire Blue Cross & Blue Shield,* 920 F.Supp. at 484.

▇▇▇ Prudential, when considering Velez's request for coverage, was exposed to these conflicts. Prudential does not dispute that it serves as both the claims fiduciary for the plan and pays approved claims from its own assets. To the extent that Prudential has discretion to avoid paying claims, it, at the same time, enhances its ability to increase its income. No evidence has been presented to suggest that Prudential has a mechanism to collect from Chemical, Velez's employer, retrospectively for unexpected liability. *See Doe,* 3 F.3d at 86. Thus, Prudential is at financial risk if the cost of its claims exceeds the premiums it has collected.

Prudential asserts that it is immune from these conflicts and points to its "independent" Medical Care Ombudsman Program ("Ombudsman Program") which reviews the appropriateness of recommended treatment plans submitted to Prudential for coverage. According to Prudential, the Ombudsman Program is an independent corporation which offers expert review of treatment plans.

Prudential's argument that this mechanism eliminates the potential for conflicts is unpersuasive. The reviewers, "experts" in the types of cases they review and selected by the program, compile recommendation reports for Prudential's use. From Prudential's description of the program, it is apparent that the opinions of the reviewers, simply serve as one of a number of factors that inform Prudential's Technology and Clinical Practice Assessment ("TCPA") unit, which makes the ultimate coverage determination. The identity of the reviewers remains secret, thus making it difficult to judge their qualifications or objectivity; it is further unclear how much or little weight Prudential actually affords to those reports in rendering its decisions. Moreover, the TCPA retains responsibility for applying the scientific and medical facts set forth in the Ombudsman Program reports to Prudential's criteria for services covered. For example, in response to the Ombudsman Reports' assertions that it is not clear that tandem therapy is "more effective" than standard therapy, Prudential determined that the procedure was ineffective and therefore not "medically necessary" under the terms of the Plan.

Accordingly, this Court finds that Prudential was influenced by a conflict of interest when it denied plaintiff's benefits. We do not at this point reach the question of whether the conflict was sufficiently serious to trigger *de novo* review. *See Sullivan v. LTV Aerospace,* 82 F.3d 1251 (2d Cir.1996), note 3, *infra.* In our consideration of whether plaintiff had demonstrated significantly serious questions going to the merits of her case, we therefore apply the arbitrary and capricious standard of review but, as we are required to do, "weigh[ ] [in the conflict] as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957.

▇▇▇ The question remains as to how that arbitrary and capricious standard actually applies here. Since our Court of Appeals has yet to provide a precise methodology for applying the "weighted" *Firestone* standard, we look to other Circuits. In *Whitney v. Empire Blue Cross Blue Shield,* 920 F.Supp. 477, the court comprehensively reviewed the various approaches adopted by other Circuits, distilling them into two models: the "continuum approach" and the "two-step" approach. *Whitney,* 920 F.Supp. at 484.

The "continuum approach," followed by the Fourth and Seventh Circuits imagines the arbitrary and capricious standard as a range, with review being "more penetrating the greater [ ] the suspicion of partiality, [and] less penetrating the smaller the suspicions." *Van Boxel,* 836 F.2d at 1052–53. Thus, "deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Medical Services,* 3 F.3d at 86; *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048 (7th Cir.1987).

▇▇▇ Since the continuum approach can be difficult to apply and can result in a lack of clarity and hence a degree of unfairness to health care providers, we apply the "two-step approach" which provides a clearer framework for evaluation, more predictably and a greater measure of protection to both

providers and beneficiaries. *See Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322–23 (9th Cir.1995); *Brown,* 898 F.2d at 1564–65; *Denton v. First National Bank of Waco,* 765 F.2d 1295 (5th Cir.1985); *Whitney,* 920 F.Supp. at 486. Under that approach, the beneficiary must first provide material and probative evidence tending to show that the fiduciary's conflict of interest was sufficiently serious to cause a breach of the administrator's fiduciary obligation to the beneficiary. *Atwood,* 45 F.3d at 1323. If the beneficiary "makes the required showing, the principles of trust law require [the court] to act very skeptically in deferring to the administrator who appears to have committed a breach of fiduciary duty." *Id.* (citing *Firestone,* 489 U.S. at 111, 109 S.Ct. at 954–55). The court then reviews the denial under the weighted arbitrary and capricious standard, first determining whether the beneficiary proposed a sound, legally correct interpretation of the disputed plan provision that could rival the fiduciary's interpretation. *Whitney,* 920 F.Supp. at 486. Thereafter, the court evaluates whether the fiduciary was arbitrary and capricious when it adopted a different interpretation. *Whitney,* 920 F.Supp. at 485.

*Pagan v. NYNEX Pension Plan,* 52 F.3d 438 (2d Cir.1995), upon which defendant heavily relies, is consistent with the two-step approach. *Pagan* acknowledges that the existence of an alleged conflict, while not altering the arbitrary and capricious standard of review, "becomes a factor in determining whether there is an abuse of discretion." *Pagan,* 52 F.3d at 442 (citing *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956–57).[3] In that case, the court applied the traditional arbitrary and capricious standard because, unlike

here, plaintiff adduced no evidence of a conflict of interest and thus failed "to explain how such an alleged conflict affected the reasonableness of the [reviewing] Committee's decision." *Id.* at 443. Here, in contrast, plaintiff has presented specific facts indicating Prudential's conflicting interests.

■ "Inasmuch as [the plan fiduciary] purports to rely upon a policy exclusion to justify its denial of coverage, it bears the burden of showing the applicability of that exclusion." *Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571, 578 (N.D.N.Y.1993). That burden does not, of course, relieve Velez of her burden of establishing her entitlement to interlocutory relief. Thus, Velez is still required to show that Prudential's decision to deny her coverage, in light of the conflicts, was not arbitrary and capricious. This Court, applying the two-step approach, finds that plaintiff has raised substantial issues that are fair ground for litigation going to whether defendant acted arbitrarily and capriciously in denying her coverage.

■ Having already determined that Prudential denied Velez's request for precertification under the influence of conflicts, this Court must determine whether those conflicts were sufficiently serious to affect Prudential's benefit determination.

■ As a fiduciary, Prudential cannot disregard any policy requirement, nor can it implicitly incorporate into the policy any term that does not expressly appear. *See Shelden v. Barre Belt Granite Employer Union Pension Fund,* 25 F.3d 74 (2d Cir.1994) ("[the arbitrary and capricious] standard may

---

3. Our Court of Appeals has recently noted that where a plan administrator is shown to have a conflict of interest, two inquiries are pertinent to the arbitrary and capricious analysis:

First, whether the determination made by the administrator is reasonable, in light of competing interpretations of the plan; second, whether the evidence shows that the administrator was, in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo.

*Sullivan v. LTV Aerospace,* 82 F.3d 1251, 1256 (2d Cir.1996). Here, we do not reach the question of whether de novo review may be warranted, as it is an issue that requires a more complete evidentiary record than is presently available. For the purposes the motion for preliminary injunction presently before the Court, Velez has more than sufficiently shown that there are genuine questions going to the reasonableness of Prudential's interpretation of the plan, *see infra* p. 20—22, and to whether Prudential's decision to deny the desired treatment was influenced by the potential financial loss it would suffer by extending coverage. *See infra* p. 23—24. Those issues are fair game for litigation.

well be met if the trustees have, for example, 'impose[d] a standard not required by the plan's provisions or interpret[ed] the plan in a manner inconsistent with its plan needs.'" (citing *Miles v. New York State Teamsters Conference*, 698 F.2d 593, 599 (2d Cir.) *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983)); *Clarke v. Bank of New York*, 687 F.Supp. 863, 867 (S.D.N.Y.1988). "The fiduciary's duties are dictated by the policy, such that a fiduciary who ignores the terms of the policy and inserts its own terms acts arbitrarily and capriciously." *Kekis*, 815 F.Supp. at 579.

■ Prudential claims, as one of the grounds for its denial, that the tandem treatment is medically unnecessary. As defined under the plan, a service is "medically necessary" if it is the opinion of the appropriate specialty of the United States medical profession is "that [the treatment] is safe and effective for its intended use, and that its omission would adversely affect the person's medical condition." Prudential has apparently interpreted this provision as permitting coverage of only those procedures that are *more effective* than other standard treatments. One of two Ombudsman Program reports relied upon by Prudential in making its benefits determination states that tandem transplants are "unproven to be superior to single courses" of the treatment. The second report similarly noted that "there is some data indicating that double transplant is safe, but there is little data on it's effective [sic] *as compared* with single cycle HDC ..." While Prudential based its determination on its assessment that HDC–ABMT was not superior to the standard treatment, that is not the requirement of the Plan's criteria. The imposition of a standard not required by the plan's provisions is certainly evidence that tends to show Prudential's conflicts influenced its decision making. *Atwood*, 45 F.3d at 1323.

■ This Court must next address the second step of the inquiry: whether the employee has proposed a sound interpretation of the plan. *See Whitney*, 920 F.Supp. at 486. As previously noted, plaintiff has already offered a sound interpretation of the "medically necessary" provision of the plan

that rivals the interpretation advanced by Prudential.

Because it is possible that the various clauses within the policy suggest that various forms of chemotherapy treatment as well as procedures involving bone marrow transplants are covered, this Court further finds that the policy is subject to multiple interpretations as to whether tandem HDC–ABMT treatment is excluded under the Plan's "experimental" provision. The Plan contains a number of provisions that list services that Prudential covers and those that it does not. Included in those services covered are "treatment by x-ray, radium or any radioactive substance, or by chemotherapy." Plan, p. 16. The Plan also includes as a covered service "[a]ny services and supplies ... that are required for a live donor as a result of a surgical transplant procedure which is not an experimental procedure." As noted earlier, defendant concedes that the bone marrow transplant in and of itself is not experimental under the plan. Indeed, it is under the terms of the Plan that Prudential guaranteed coverage for plaintiff's first round of HDC–ABMT treatment.

Because of the ambiguity, a reasonable interpretation of these two clauses is that if single HDC–ABMT treatment is covered, tandem treatment is similarly covered. This constitutes a "sound" interpretation and thereby satisfies plaintiff's burden on the issue.

■ Since Velez has met her burden of putting forward a "sound" interpretation of the plan, the next question is whether Prudential, in determining that Velez's treatment was "medically unnecessary" and "experimental" was acting arbitrarily and capriciously when it adopted a different interpretation. "A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown*, 898 F.2d at 1566–67.

In justifying its denial, Prudential first relies on the terms of the protocol that Velez submitted in support of her application for precertification. Prudential makes much of the protocol's description of the proposed treatment as part of a research study to determine whether sequential high-dose treatment was more effective treatment than single dose treatment. Prudential cites to terms of the Plan under which Prudential has the discretion to deny a service if it is "under study or in a clinical trial to evaluate its safety or efficacy." Yet, Prudential has also stated that it would be willing to fund single-dose treatment described in research protocols. Prudential's varying application of its "under study or ... clinical trial" exclusion, and consequential denial of Velez's tandem treatment, provides support for plaintiff's contention that Prudential abused its discretion in denying plaintiff's request for precertification.

As further evidence of that abuse, this Court notes that Prudential initially denied Velez's request for precertification on the ground that the treatment simply was not "medically necessary." When plaintiff requested reconsideration, Prudential changed its reasons for the denial, stating that the procedure was "experimental/investigatory." Such abrupt shifts in position by Prudential without elaboration or justification are clear indicia of capriciousness.

Moreover, the equities weigh in favor of plaintiff. The urgency of plaintiff's request for relief and the fact that any delay in granting relief will diminish the treatment's chance of success gravitate in favor of the relief sought. Her doctors have expressed the belief that, if the treatment does not cure Velez of her cancer, it will at least substantially extend her life.

Prudential points to no specific harm that it would suffer beyond the cost of the second phase of the tandem treatment. Although the cost of treatment is certainly not insignificant, as multiple myeloma is a rare form of cancer, Prudential has not shown that the result in this case is likely to result in a flood of similar cases. *Cf. Dozsa v. Crum & Forster Insurance Co.,* 716 F.Supp. at 140.

As previously noted, the party seeking preliminary injunction need only prove either likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Kekis,* 815 F.Supp. 571 at 584; *Jackson Dairy,* 596 F.2d at 72. Velez has met the test for a preliminary injunction. She is likely to succeed on the merits. She has certainly demonstrated sufficiently serious questions going to the merits, making them fair ground for litigation, and the balance of hardships tipping sharply in her favor.

Under Rule 65(c) of the Federal Rules of Civil Procedure, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant." The security required shall be "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." Fed. R.Civ.P. 65(c). Accordingly, the plaintiff is ordered to post a bond of one thousand dollars within three business days of the date of this Order.

## III. CONCLUSION

In conclusion, plaintiff's motion for a preliminary injunction is granted. Defendant shall forthwith precertify plaintiff's second phase of HDC–ABMT treatment.

**SO ORDERED.**